IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHONN LYNN PARDUE,<br><br>     Petitioner,<br><br>  vs.<br><br>WARREN L. MONTGOMERY, Warden,<br>Calipatria State Prison,[1]<br><br>     Respondent. | No. 2:14-cv-02255-JKS<br><br>MEMORANDUM DECISION |

   Shonn Lynn Pardue, a state prisoner proceeding *pro se*, filed a Petition for a Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Pardue is in the custody of the

California Department of Corrections and Rehabilitation and incarcerated at Calipatria State

Prison.  Respondent has answered, and Pardue has not replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

   On March 3, 2010, Pardue was charged in an 11-count information when, in the course of

the breakup of a romantic relationship, he violently lashed out at his former girlfriend, Dominque

Griffin, her family, and a friend.  The information included the following charges: assault with a

firearm on Mikio Morris, with personal use of a firearm allegation (count 1); kidnapping of

Morris, with personal use of a firearm (count 2); criminal threats against Morris, with personal

use of a firearm (count 3); attempted criminal threats against Vivian Richardson (count 4);

assault with a firearm on Mark McFadzean, with personal use of a firearm and personal infliction

---

[1]   Warren L. Montgomery, Warden, Calipatria State Prison, is substituted for F.
Foulk, Warden, High Desert State Prison.  FED. R. CIV. P. 25(c).

of great bodily injury allegations (count 5); kidnapping of McFadzean, with personal discharge

of a firearm and personal infliction of great bodily injury (count 6); kidnapping of Griffin (count

7); criminal threats against McFadzean, with personal use of a firearm (count 8); criminal threats

against Griffin, with personal use of a firearm (count 9); criminal threats against D.W., with

personal use of a firearm (count 10); and unlawful possession of ammunition by a felon (count

11).  The information further alleged that Pardue had two prior serious felony convictions.

Pardue pled not guilty to the charges and proceeded to jury trial.  On direct appeal of his

conviction, the California Court of Appeal described the following events underlying the charges

against Pardue and the evidence presented at trial:

> **The Prosecution's Case**
>
> [Pardue] and victim Dominique Griffin had a romantic relationship that ended in February 2008 when [Pardue] moved out of the home they had shared with their three-year-old daughter and Griffin's eight-year-old son and 15-year-old daughter, D.W.
>
> In the early afternoon of March 2, 2008, [Pardue] became upset when he could not find Griffin at her home and saw in her driveway the car of a man, Mark McFadzean, whom [Pardue] believed was Griffin's new boyfriend.[4]  D.W. telephoned Griffin's mother, Vivian Richardson, and said [Pardue] was at the house acting crazy.  Richardson has known [Pardue] since he was a child and knows him to be prone to "excited episodes."  [Pardue] then phoned Richardson, said he was upset about the end of his relationship with Griffin and planned to vandalize the new boyfriend's car or have it impounded.  Richardson asked her godson, Mikio Morris, to protect McFadzean's car by blocking it with her truck.  Morris did so.  Morris then walked down the street to get an ice cream.  As he walked back toward the house, [Pardue] met Morris in the driveway.  He put his arm around Morris, pressed a gun in Morris's rib, and ordered him into Griffin's house, saying he did not want to shoot Morris outside.  Inside, Morris saw [Pardue's] two nephews, looking mad.  At gunpoint, [Pardue] questioned Morris about Griffin's whereabouts.  Morris said he had had an argument with Griffin and had not spoken to her for about a month.  [Pardue] demanded to check Morris's cell phone call history and threatened to shoot Morris if Griffin's number appeared.  When Griffin's number did not appear in the cell phone, [Pardue] wept and said he did not know where Griffin or their daughter was.  Morris received a phone call from Richardson and told her that [Pardue] was at the house with a gun.  [Pardue] moved out of Morris's view, and Morris heard clinking sounds like the unloading of a gun.  [Pardue] returned and showed Morris that the gun was unloaded.

FN4.   Griffin and McFadzean testified they were just friends at the time of the offenses (March 2008).  But by the time of trial in March 2010, they were married.

Richardson, without calling the police, drove to Griffin's house.  [Pardue], crying and angry, said he was going to take his daughter, kill himself and everyone else.  Richardson did not take the threats seriously and told [Pardue] to stop talking crazy.  She never saw [Pardue] holding a gun at the house that day but she did see a revolver on a table.

Richardson said she would give [Pardue] his daughter in exchange for [Pardue] releasing Morris.  Richardson testified she feared [Pardue] might hurt Morris but believed [Pardue] would not hurt his own daughter.  Everyone drove in Richardson's van to her home, a short distance away.  Morris went inside, got [Pardue's] daughter and gave her to [Pardue].  [Pardue] physically blocked Morris from getting back into the van, and Richardson told Morris to stay.  Richardson drove [Pardue], his daughter, and his nephews to a grocery store and thereafter dropped them all off with [Pardue's] sister, Nedra King.  No one called the police at that time.

Richardson later received a phone call from Griffin, who was in Los Angeles.  Richardson related what had happened.  Griffin said to call the police.  Richardson was reluctant because she did not want to get [Pardue] in trouble, and having watched prior similar episodes of [Pardue], she did not believe his conduct was completely out of the ordinary.  When Richardson eventually spoke with police, she said she had not called them because [Pardue] threatened to kill everyone if she did.  Her main motivation was to get [Pardue] away from her family.

Griffin and McFadzean returned that night around 10:30 or 11:00 p.m. (according to Griffin) or between 9:00 and 11:00 p.m. (according to McFadzean).  The security gate on Griffin's front door was locked.  D.W. let them in.  Griffin saw that her bedroom had been ransacked.  As she walked through the house, [Pardue] jumped out from behind a speaker, where he had been hiding.  He had a gun in his hand and said, "I'm gonna fucking kill you."  She picked up a phone.  He pointed the gun at her, said, "Put the fucking phone down," and "I'm gonna kill you."  She feared for her life and threw the phone down.

[Pardue] grabbed McFadzean around the neck from behind, hit him with the gun, pulled him into the living room and had him sit or kneel.  McFadzean said he was Griffin's friend.  [Pardue] said, "That's my fuckin' wife."  [Pardue] got upset, yelling and screaming.  D.W. came out of her room.  Griffin testified that everyone was yelling and screaming, pleading with [Pardue] to calm down. McFadzean, who is smaller than [Pardue], testified he was afraid for his life and kept quiet.  [Pardue] kept pointing the gun back and forth, saying, "You guys, I'll fucking kill you."  Griffin pleaded with [Pardue] just to take her and leave everyone else alone.  [Pardue] replied, "No, this mother fucker is my ticket to Oak Park."

[Pardue] grabbed McFadzean in a headlock with a gun to his head.  Griffin, followed by [Pardue], who was holding McFadzean, went outside.  [Pardue] told Griffin to drive.  [Pardue] made McFadzean lie face down in the backseat of Griffin's car and

held the gun to the back of McFadzean's head.  D.W., who had insisted on accompanying them, tried to talk [Pardue] down.[5]  [Pardue] directed Griffin to drive to his sister Nedra's home and honk the horn.  No one came out.  [Pardue] told Griffin, "Your daughter's in that house.  Go get [her], go."  Griffin knocked on the door but no one answered.  [Pardue] started screaming for his sister to come outside, with no response.  [Pardue] started shaking, rocking the car, and saying "This is what you want.  This is what you want," and fired the gun, shooting McFadzean in the leg.  [Pardue] jumped out of the car.  Griffin ran to the back of the car and saw McFadzean's head hanging down outside of the car, with his legs still inside the car.  [Pardue], with the gun in his hand, said, "I'm gonna kill this mother fucker.  I'm going to kill this mother fucker."  [Pardue's] sister and niece came outside, distracting [Pardue].  Griffin and D.W. got back in the car and drove off with McFadzean toward a hospital.  Griffin called 911 as they drove.  They stopped when they saw a police officer, and the officer summoned an ambulance.

   FN5. D.W. did not testify.

  The jury saw a video captured by a camera mounted on the patrol car, showing Griffin and D.W. upset outside the car while the police assisted McFadzean.  The video also showed Vivian Richardson arriving about 45 minutes later, and a crime scene investigation officer opening the trunk of the car, allowing Griffin to remove belongings before the car was impounded.

  While Griffin was in the police station, she received a phone call from [Pardue].  He demanded, "Why did you tell the police I kidnapped my daughter?"  By that time, the incident had been reported on the news.

  Later, after Griffin arrived at her home, she asked the police to check the premises because she was in fear [Pardue] might be lying in wait for her.  The police found a duffel bag in Griffin's yard.  The yard was wet from a recent rain, but the duffel bag was dry. The bag contained .357 revolver ammunition, [Pardue's] parole card, and personal photos of [Pardue] and Griffin, including some of a sexual nature.[6]

   FN6. The parties stipulated [Pardue] was a felon at the time he was alleged to be
     a felon in possession of ammunition.

  [Pardue] called Griffin later on March 3, claiming he was leaving town with their daughter and would get a new mother for her.  However, Griffin was able to retrieve the child from [Pardue's] relatives.

  Police arrested [Pardue] in Las Vegas a year later, in March 2009.  When arrested, [Pardue] used the name of his brother, Richard Pardue.

  A treating trauma surgeon testified McFadzean lost a substantial amount of blood before arriving in the emergency room and would have died within a couple of hours without medical treatment.  A projectile penetrated the right thigh and lodged in the left thigh.  The femoral artery in McFadzean's right leg was cut in half, and the femur bone in his left thigh was shattered.  McFadzean was in surgery for several hours.  Doctors removed a vein from his left leg to repair his artery and placed a rod in his left leg to

replace the shattered bone.  The surgeon removed bullet fragments from his leg and opined that the wounds were consistent with gunshot wounds.  McFadzean remains in pain and will have to take medication for the rest of his life to avoid a fatal blood clot.

McFadzean testified that he lost consciousness shortly after being shot.  The next thing he remembered was waking up in the hospital connected to breathing tubes.

At trial, as at the preliminary hearing, McFadzean identified [Pardue] as the perpetrator.  McFadzean did not identify [Pardue] when police presented him with a photo lineup in the hospital; but at that time he was in pain, on pain medication, and attached to breathing tubes.

On the witness stand, Griffin admitted she was convicted of "two felonies involving moral turpitude" in 2005.  McFadzean admitted he was convicted of "three crimes of moral turpitude" in 1992, "a crime of moral turpitude" in 1993, "two crimes of moral turpitude" in 1996, and two or three other "crime[s] of moral turpitude" between 1997 and 1999.  By 2008, he had turned his life around and had become an auto mechanic and business owner.

**The Defense Case**

The defense called [Pardue's] sister Nedra King as a witness, but she invoked the privilege against self-incrimination.

[Pardue's] niece, A.B., testified.  She claimed she did not hear a gunshot and came out of her house because someone knocked on the door.  She saw [Pardue] and Griffin arguing not far from a burgundy car, and saw D.W. crying and screaming.  A.B. said she did not know what was happening and ran around the corner to get a cousin.  When she returned, the group was gone.  The niece initially denied seeing a man in the car but admitted it after the prosecutor confronted her with her statement to police.  She admitted she was "adjudicated for a crime involving moral turpitude" in 2006.

[Pardue's] older brother, Richard Pardue, testified to his opinion that Griffin is untrustworthy, based on her having falsely told [Pardue] that she and Richard had had sex.  Richard believes he and [Pardue] are honest persons.  Richard admitted he was convicted of "a misdemeanor crime of moral turpitude" in 2001.

*People v. Pardue*, No. C064864, 2014 WL 1571806, at *2-5 (Cal. Ct. App. April 19, 2014).

At the conclusion of trial, the jury returned verdicts finding Pardue guilty on all counts except count 10, as to which the jury found him not guilty of criminal threats against D.W. but guilty of the lesser included offense of attempted criminal threats.  The jury also found true three allegations of personal use of a firearm and two allegations of personal infliction of great bodily injury.  Because Pardue waived his right to a jury trial on the prior conviction allegations, the court conducted a bench trial and found true the two prior serious felony conviction allegations.

The court declined to strike the allegations under *People v. Superior Court (Romero)*, 917 P.2d 628 (Cal. 1996).[2]  The court subsequently sentenced Pardue to an aggregate term of 175 years to life imprisonment plus a determinate imprisonment term of 11 years and 4 months.

Through counsel, Pardue appealed his conviction, arguing that: 1) the prosecutor discriminated against African-Americans during jury selection;[3] 2) the trial court improperly excluded third party culpability evidence; 3) trial counsel was ineffective for failing to object for impeachment purposes to sanitizing the victims' prior convictions; 4) the prosecutor committed misconduct during summation; and 5) the trial court made various sentencing errors.  On April 19, 2014, the Court of Appeal issued a reasoned, unpublished opinion agreeing that there were sentencing errors and remanding for resentencing, but otherwise affirming the judgment against Pardue.  *Pardue*, 2014 WL 1571806, at *24.  Pardue petitioned for review in the California Supreme Court, which was summarily denied on July 23, 2014.

Pardue timely filed a *pro se* Petition for a Writ of Habeas Corpus to this Court on September 24, 2014.

---

[2]        *See also* CAL. PENAL CODE §§ 667(a)(1) & (b)-(I), 1170.12(a)-(d).

[3]        *See Batson v. Kentucky*, 476 U.S. 79 (1986) (a shorthand reference to the procedure under which a prosecutor's peremptory strikes of potential jurors are challenged on the basis that the strikes are being made on a discriminatory basis, i.e., because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds); *People v. Wheeler*, 583 P.2d 748 (Cal. 1978) (the California counterpart to *Batson*).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Pardue raises the four grounds for relief he unsuccessfully raised before the state courts, namely: 1) the prosecutor committed a *Batson* violation; 2) the trial court erroneously excluded exculpatory evidence; 3) defense counsel was ineffective for failing to object to improperly sanitized impeachment; and 4) the prosecutor committed misconduct during summation.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are
beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.
Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was
correctly applied).  It is a fundamental precept of dual federalism that the states possess primary
authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,
67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and
application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state
court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536
U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned
decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)
(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the only decision on
Simmons' collateral review claims was a summary denial by the California Supreme Court on
habeas review, which is an adjudication on the merits and entitled to deference.  *Harrington v.
Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are
presumed to be correct unless the petitioner rebuts this presumption by clear and convincing
evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Pardue has not replied to Respondent's answer.  The relevant statute provides that "[t]he
allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a
habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.    <u>*Batson* Claim</u> (Ground One)

Pardue first argues that the prosecution impermissibly used a peremptory challenge to excuse from the jury pool a potential juror whom the Court of Appeal referred to as "Ms. A." The appellate court laid out the following facts underlying this claim:

> [Pardue] is African–American.  The record indicates the venire included four prospective jurors who are African–American.  Based on the number of jury questionnaires in the record, there were a total of 64 prospective jurors in the venire. During voir dire, the prosecutor used a peremptory challenge to excuse an African–American woman, Ms. A.  The jury, as ultimately sworn, contained one African–American juror.
> On March 9, 2010, before the jury was sworn, defense counsel stated on the record that he had not immediately objected to the peremptory challenge of Ms. A. but, before the next peremptory challenge, he had asked to approach, at which time, the court and counsel had gone into chambers.  At that time, defense counsel had asked to set forth a prima facie case for a *Wheeler/Batson* motion, but the trial court had stated it was too late because the prospective juror was probably already gone and was no longer available, and defense counsel could make his record later.[9]

> > FN9.   On appeal, the People agree with [Pardue] that it was not too late for a *Wheeler/Batson* motion, because the jury had not yet been impaneled at that point.  Also, we note that the "usual remedy" for a *Wheeler/Batson* violation is not seating the improperly challenged juror, but rather declaring a mistrial, dismissing the remaining panel and starting jury selection anew.  Alternative remedies, such as seating the improperly excused juror or additional challenges for the moving party, may be provided upon the moving party's consent or waiver of the "usual remedy."  Consequently, the fact that an improperly excused juror is no longer available does not preclude a *Wheeler/Batson* violation finding.

After the jury was sworn, defense counsel stated on the record that he was now moving for a mistrial, "because there is nothing we can do about it now, because the jury has been sworn." Defense counsel said that when Ms. A. was dismissed, there was only one other African–American in the box (who became a sworn juror) and no African–Americans in the audience. He had excused for cause one prospective African–American juror. The prosecutor had used a peremptory challenge on one other prospective African–American juror, Mr. C.[10] In defense counsel's opinion, the prosecution should have wanted Ms. A. as a juror, because she was a victim of domestic violence in the 1980's, and in defense counsel's opinion ("it was my own perception"), Ms. A.'s body language suggested displeasure when she described her daughter's decision not to pursue prosecution when the daughter was sexually assaulted.

> FN10.   [Pardue] repeatedly emphasizes that the prosecutor peremptorily challenged two of the four available African–American jurors. However, defense counsel did not complain about the prosecutor's peremptory challenge of Mr. C. "The failure to articulate clearly a Wheeler/Batson objection forfeits the issue for appeal." Consequently, we reject [Pardue's] attempt to use the excusal of Mr. C. to bolster his showing on appeal.

The trial court stated the defense had not made a prima facie case. The court nevertheless invited the prosecutor to respond.

The prosecutor noted he himself is African–American[11] and offered his reasons for excusing Ms. A.: "[S]he explained that she had a domestic violence [previously]. I don't think that's something that a prosecutor necessarily wants to have on a domestic violence case, especially in light [of] the fact that she did not notify law enforcement. [¶] I asked her if she continued a relationship with that individual afterwards. She was unclear about it. Additionally, it didn't appear that law enforcement was called when her daughter was raped or sexually assaulted. [¶] I had an issue with that because it appeared that she didn't call law enforcement when these terrible things happened to her. I didn't know if that meant she had an issue with law enforcement or if she didn't think that what happened was important enough. [¶] Furthermore, your Honor, she stated that her son had a recent assault where he was prosecuted, and that occurred fairly recently. [¶] So I think in light of the numerous issues with her family and herself, we were more than justified to excuse her."

> FN11.   We note that this circumstance is not relevant to the determination of whether the prosecutor excused Ms. A based on group bias. What would have been relevant is the race of the victims and witnesses in the case. When the victims and/or prosecution witnesses are members of the cognizable group, this circumstance cuts against a finding of group bias because there is less motive for the prosecutor to discriminate against prospective jurors who are members of the same group. However, the record here does not reflect that the prosecutor informed the court of the

race of the victims during the *Wheeler/Batson* motion and we are unable to determine their race otherwise.

The trial court denied the mistrial motion, stating regarding the prosecutor's characterization of Ms. A.'s voir dire, "that's what I recall, which made sense to me as to why she was excluded.  [¶]  There's no basis upon which I can grant the motion.  [¶]  It's denied."

*Pardue*, 2014 WL 1571806, at *5-6 (citations omitted).

The Equal Protection Clause prohibits purposeful racial discrimination in the selection of the jury.  *Batson*, 476 U.S. at 86.  In *Batson*, the Supreme Court outlined a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause: 1) a defendant raising a *Batson* claim must establish a *prima facie* case of discrimination; 2) once a *prima facie* case of discrimination is established, the burden of offering race-neutral reasons for the strikes shifts to the prosecutor; 3) after the prosecutor offers race-neutral reasons, the trial court has the duty to determine if the defendant has established purposeful discrimination.  *Paulino v. Harrison*, 542 F.3d 692, 699 (9th Cir. 2008) (citing *Batson*, 476 U.S. at 98).

A defendant's burden to establish a *prima facie* case at the first step and the prosecutor's burden to provide race- (or ethnic-) neutral reasons for the challenge at the second step are burdens of going forward with the evidence, while the defendant's burden at the third step is a true burden of persuasion to convince the court that the challenge was motivated at least in part by some prohibited group bias or prejudice.  The ultimate burden of persuasion never shifts. *Batson*, 476 U.S. at 93; *see Purkett v. Elem*, 514 U.S. 765, 768 (1995).

In this case, the trial court stated that Pardue had not satisfied the first step by showing a *prima facie* case of discrimination.  The Court of Appeal, however, in conformity with then-

controlling California law declined to address whether Pardue established a *prima facie* case and instead considered whether the prosecutor's proffered reasons for striking Ms. A. from the jury provided a genuine, race-neutral justification for the challenge. *Pardue*, 2014 WL 1571806, at *7.

     1. *Is the first Batson step regarding a prima facie case moot in this case?*

Since the Court of Appeal issued a reasoned, though not published opinion, normally this Court would review only that opinion and ignore an earlier opinion by the trial court. Thus, since the Court of Appeal focused on the second and third prong of the *Batson* rule and ignored the first step, this Court would be limited to the second and third steps and evaluate the Court of Appeal's decision giving due AEDPA deference. There is, however, an important reason for not limiting review in this way, and the absence of a prima facie case is of great importance.

The Court of Appeal did not disagree with the trial court's conclusion that Pardue had failed to make a *prima facie* case at step one of the *Batson* analysis. Rather, the trial court followed then-controlling precedents from the California Supreme Court which strongly recommended that trial courts do not stop the *Batson* inquiry at the first step but in all cases should ask the prosecutor for her reasons.[4] The explanation for this is set out in the Court of Appeal's decision. In *People v. Wheeler*, 583 P.2d 748 (Cal. 1976), the California Supreme Court anticipated *Batson* by eight years and adopted a three-step procedure almost identical to the one later adopted in *Batson*. The California rule differed in two respects from *Batson*, its

---

    [4]    The California Supreme Court encourages California trial courts to ask prosecutors for explanations of contested peremptory challenges even in the absence of a *prima facie* case. *See People v. Howard*, 175 P.3d 13, 25 (Cal. 2008); *People v. Bonilla*, 160 P.3d 84, 105 n.13 (Cal. 2007).

rule was predicated on the California equivalent to the Sixth Amendment right to a jury chosen from a fair cross section of the community while *Batson* rests upon the equal protection clause of the Fourteenth Amendment, and more important for this case, *Wheeler's* first step required the defendant to prove a "strong likelihood" that the prosecutor's pre-empt was discriminatory to make a *prima facie* case while *Batson* only required "an inference of a discriminatory purpose" to satisfy the first step. *Compare Wheeler*, 583 P.2d at 764-66, with *Batson*, 476 U.S. at 98.

In *Johnson v. California*, 545 U.S. 162, 168 (2005), the United States Supreme Court followed the Ninth Circuit and disapproved the "strong likelihood" formulation of step one, stressing that the defendant was not required to prove discrimination at step one but need only raise an inference. Thereafter, a real danger existed that an appellate court, perhaps years after the trial, would disagree with a trial court's rejection of a defendant's *prima facie* case and remand for a new trial at great expense to the parties and at the risk that evidence would be lost and witnesses unavailable. By requiring trial courts to make a record regarding the prosecutor's reasons in every case, the necessary record would be available to consider steps 2 and 3 should a later court disagree about the presence of a *prima facie* case of group bias. If, however, evidence of the prosecutor's actual motivation was present in every case, it seemed reasonable to hold that a finding that the defendant had failed to make a *prima facie* case was moot because the purpose of the *prima facie* case in the *Batson* formulation was to trigger the prosecutor's duty to explain her pre-empt. *See People v. Mills*, 226 P.3d 276, 293-95 (Cal. 2010)( where the trial court finds no *prima facie* case but permits the prosecutor to state her reasons and accepts the credibility of the reasons there is a first stage/third stage hybrid, the rejection of the *prima facie* case is moot, the reviewing court expresses no opinion on the presence of a *prima facie* case and skips directly

to the third stage and determines in light of the prosecutor's reasons whether defendant has proved intentional discrimination).

Recently, the California Supreme Court rethought *Mills* and like cases and concluded that where the trial court rules that there is no *prima facie* case but hears from the prosecutor and finds the prosecutor's race neutral reasons credible and denies a *Batson* challenge at the third stage, an appellate court should nevertheless rule on the *prima facie* case.  *See People v. Scott*, 349 P.3d 1028, 1044-48 (Cal. 2015).  In so doing, the court should not consider the prosecutor's purported race-neutral reasons at the first stage, and if the trial court's finding of no *prima facie* case is affirmed, must nevertheless consider whether the prosecutor's second stage explanation is itself discriminatory.  *Id.* at 1048.

If the only purpose for requiring a *prima facie* case was to trigger a race-neutral explanation for the challenge, and under California's prudential rule the prosecutor will always be required to give a contemporaneous explanation for a disputed challenge, then the first *Batson* step will always be "moot" and might as well be dispensed with.  It seems, therefore, that this Court should consider whether Pardue made a *prima facie* case.  If he did, that fact alone would lend weight to the ultimate question whether Pardue proved by a preponderance of the evidence that the prosecutor's challenge to Ms. A. was race-based.  Here, the trial court explicitly stated, "The Court does not believe that a *prima facie* case has been made yet."  The first step of *Batson* has thus not been mooted.  *See Hernandez v. New York*, 500 U.S. 352, 359 (1991) (existence of *prima facie* case mooted when the prosecutor volunteered an explanation and the trial court ruled on the ultimate issue of intentional discrimination without ruling on the preliminary issue). Based on the previously-discussed recent jurisprudence from the California Supreme Court, this

-14-

Court agrees that where, as here, the trial court determined that the defendant failed to establish a *prima facie* case of discrimination, a reviewing court should first review the trial court's first-stage ruling. *Scott*, 349 P.3d at 1048. This Court will therefore follow the procedure laid out by the California Supreme Court and, as discussed below, first address whether Pardue made a *prima facie* showing. *See id.* ("In sum, where (1) the trial court has determined that no prima facie case of discrimination exists, (2) the trial court allows or invites the prosecutor to state his or her reasons for excusing the juror on the record, (3) the prosecutor provides nondiscriminatory reasons, and (4) the trial court determines that the prosecutor's nondiscriminatory reasons are genuine, an appellate court should begin its analysis of the trial court's denial of the *Batson/Wheeler* motion with a review of the first-stage ruling.").

Having determined that it should review the trial court's determination that no *prima facie* case has been established, the Court must also determine the appropriate standard of review. Under AEDPA, the Court must review a state appellate court's decision under the deferential AEDPA standard to determine whether it was contrary to or an unreasonable application of *Batson*, or rested on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d)(1) & (2). Because the Court of Appeal's decision did not rest on *Batson's* first step, however, it is not clear whether AEDPA deference applies to the trial court's ruling below. Nonetheless, federal courts may deny "writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review." *Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010). In other words, if Pardue cannot demonstrate a *Batson* violation on *de novo* review, which is a more favorable standard of

review for him, he cannot succeed under AEDPA's deferential standard.  The Court will

therefore consider *de novo* whether Pardue established a *prima facie* case of discrimination.

        2.      *Prima facie case*

      To establish a *prima facie* case of discrimination under *Batson*'s first step, the defendant

must show that: 1) the prospective juror is a member of a cognizable racial group; 2) the

prosecutor used a peremptory strike to remove the juror; and 3) the totality of the circumstances

raises an inference that the strike was on account of race.  *Batson*, 476 U.S. at 96; *Crittenden v.

Ayers*, 624 F.3d 943, 955 (9th Cir. 2010).  A defendant satisfies the requirements of *Batson*'s

first step by producing evidence sufficient to permit the trial judge to draw an inference that

discrimination has occurred.  *Johnson v. California*, 545 U.S. 162, 170 (2005).

      Although an inference of discrimination may be found where the prosecutor strikes a

large or disproportionate number of panel members from the same racial group, Pardue does not

make a statistical argument and, indeed, could not do so given the small numbers involved.  *See

United States v. Collins*, 551 F.3d 914, 921 (9th Cir. 2009) ("The lack of other African-

Americans in the jury pool renders mathematical trends and patterns meaningless."); *Hargrove v.

Pliler*, 327 F. App'x 708, 709 (9th Cir. 2009) (rejecting step one of *Batson* claim because it

"hinges on a statistical argument involving very small numbers" that, "standing alone, is

insufficient to establish a *prima facie* case in light of the ample legitimate reasons in the record

for the prosecution's challenge").[5]  Additionally, the sworn jury contained one

African–American.[6]

A comparison of the stricken juror with jurors permitted to serve may also shed light on

whether there is a *prima facie* case.  *Miller-El*, 545 U.S. at 241, 247-48.[7]  But Pardue does not

point to any other jurors who shared the relevant attributes as Ms. A. that were not challenged by

the prosecutor, nor did he provide any comparative analysis on direct appeal.

Thus, the Court must determine whether there are any other indications of intentional

discrimination here.  Consistent with that review, the record of the voir dire does not disclose

any other circumstances suggesting that the prosecutor's dismissal of Ms. A. was racially

motivated.  Likewise, the record shows that the prosecutor was consistent in his review of

prospective jurors.

Nor is Pardue's claim that Ms. A. appeared on the surface to be pro-law enforcement

sufficient on its own to establish a *prima facie* case.  His argument that Ms. A., as the victim of

---

[5]     Cited for persuasive value pursuant to Ninth Circuit Rule 36-3.

[6]     While "a *prima facie* case does not require a pattern because 'the Constitution
forbids striking even a single prospective juror for a discriminatory purpose,'" *Collins*, 551 F.3d.
at 919 (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)), it is equally
clear that "the striking of one juror of a cognizable racial group does not by itself raise an
inference of discriminatory purpose," *Tolbert v. Gomez*, 190 F.3d 985, 988 (9th Cir. 1999); *see
also Crittenden*, 624 F.3d at 955-57; *Gonzales v. Brown*, 585 F.3d 1202, 1206 (9th Cir. 2009).
Thus, if after an objection the trial court finds no *prima facie* case but asks the prosecutor to
disclose her reason and she were to say, "my reason should be obvious, the juror is African-
American," the explanation would itself be sufficient to show a discriminatory motive without
further evidence of plan or comparative jury analysis.  But in the absence of an admission or
other "smoking gun," there must be some evidence to support an inference, and a single
challenge to a single juror standing alone cannot supply that evidence.

[7]     Comparative analysis is most often used at the third stage of the *Batson* rule in
evaluating the prosecutor's reasons for her pre-empt but may be used at the first stage in
determining whether there is a *prima facie* case.  *See, e.g.*, *Crittenden*, 624 F.3d at 956.

domestic violence in the 1980's and who, "in defense counsel's opinion . . . [had] body language suggest[ing] displeasure when she described her daughter's decision not to pursue prosecution when the daughter was sexually assaulted," *Pardue*, 2014 WL 1571806, at *6, would have been favorable to the prosecution is too speculative and isolated to imply a discriminatory purpose.

Accordingly, even on *de novo* review, Pardue fails to establish a *prima facie* case of discrimination and thus cannot prevail on his *Batson* claim.

3.    *Race-neutral justification*

Proceeding to the second step of the *Batson* procedure, the Court of Appeal determined that the prosecutor's stated reasons for his challenge were race-neutral on their face*:*

> Here, although there were discrepancies between the prosecutor's recollection of what Ms. A. had said on voir dire and what she actually said, the record as a whole supports the prosecutor's race-neutral explanation for excusing her.
>
> In her juror questionnaire, Ms. A. answered "Yes Rape" to the question whether she, a close friend or relative had ever been a victim of a crime, and she answered "Yes Assault" to the question whether she, a close friend or relative had ever been arrested for a crime. During voir dire, Ms. A. said she had had no negative experiences with law enforcement. When asked if she believed law enforcement should be involved in domestic violence or stay out of it, she said, "No, I don't think it should just be a family issue. [¶] . . . [¶] . . . I was a victim of domestic violence. I didn't pursue any legal action. I was blessed and fortunate that my family got me out of that situation. But I definitely—looking back, you know, in hindsight, I definitely would have taken legal—gone the legal route, because it was like so fearful. I was so fearful at that point." When asked if she regretted that she did not contact law enforcement, she said, "Yeah, I am [sic]." The domestic violence involving Ms. A. occurred in the early 1980's. She did not contact law enforcement because "given the day and the time, it wasn't as if there's the resources that are available today. And I was very fearful. And so, you know, with the resources that I'm aware of today, it would be a different situation." When asked if she stayed in the relationship after the domestic violence, she said, "Well, I was in a relationship for like three years; and I eventually just—you know, like I said, with the help of my family and friends, just they just took me away."
>
> Ms. A. additionally said her daughter was a victim, apparently of a domestic violence sexual assault, in 1993, and the police were called, but the person was not prosecuted because her daughter did not want to go forward with the case. Around 1990, Ms. A.'s son was prosecuted for a misdemeanor assault when he had had too much to

drink after graduation and got into a fight with a friend.  It was resolved before trial.  She thought her son was treated fairly.

. . . .

> [Pardue] is correct that the prosecutor was wrong when he said Ms. A.'s son's assault prosecution was "recent," because it happened 20 years earlier.  Nevertheless, this inaccuracy does not prove the exclusion discriminatory. . . .  Plus, the fact that the prospective juror's son had been accused of a crime would in itself constitute a race-neutral reason for the peremptory challenge.  Here, even if it was not recent, it is well settled that the son's assault prosecution would still have been a valid, group-neutral reason for exercising a peremptory challenge as to Ms. A.  Moreover, in the instant case, Ms. A.'s son's prosecution was one small point in the prosecutor's list of reasons for the challenge.

> The prosecutor's first reason was reluctance to have a domestic violence victim serve as a juror in a domestic violence case, particularly where the victim did not call law enforcement.  Despite the discrepancies in the prosecutor's recollection of what Ms. A said on voir dire, this is a group-neutral reason.  It is irrelevant that defense counsel claimed he would embrace such a juror were he the prosecutor.  The sincerity of the prosecutor's desire to not have jurors with such backgrounds is demonstrated by the fact that the prosecutor also used a peremptory challenge against another prospective juror, Ms. C., who had been a victim of domestic violence in the early 1990's.  Ms. C. did not call police because it did not seem necessary.  The incident happened as she was moving out of a home after a relationship ended.  But now, she does think it appropriate for law enforcement to be involved in domestic violence matters.  The record does not disclose her race.  [Pardue] does not contend she was African–American.  Thus, the record supports the sincerity of the prosecutor's explanation.

*Pardue*, 2014 WL 1571806, at *7-8 (citations omitted).

Pardue does not seriously dispute the appellate court's finding that the reasons were race-neutral on their face.  He instead focuses his argument on the third step and argues that the prosecutor's reasons, while facially race neutral, were pretexts for discrimination.  The Court of Appeal rejected this argument:

> [Pardue] argues Ms. C. cannot be compared to Ms. A., because Ms. C. never said she regretted her decision not to call the police (it was an isolated incident), whereas Ms. A. was the victim of continuous abuse, expressed regret that she did not call the police, and apparently stayed in the relationship for some time.  [Pardue] cites *People v. Lenix* (2008) 44 Cal.4th 602, 630–631 in arguing that given the differences between the two potential jurors, comparative juror analysis does not refute his claim that the prosecution's challenge of Ms. A. was discriminatory.  However, it is [Pardue's] burden to show purposeful discrimination.  The differences noted by [Pardue] are not so

significant as to require the trial court to doubt the prosecutor's credibility. Both prospective jurors were victims of domestic violence who had not reported their abuser to the police, and the court was justified in accepting the prosecutor's explanation that he did not want people with that background on the jury.

Additionally, the record supports the prosecutor's uncertainty about Ms. A. She was unclear in her response to his question whether she continued the relationship with her abuser. Furthermore, the prosecutor was not required to accept Ms. A.'s expression of a current opinion that government should be involved in such family disputes, which was inconsistent with her past actions. This is not to say that Ms. A. was deceptive. It would be perfectly normal for her attitude to have changed over time in the years since she was a victim. The point is that a prosecutor is not required to gamble on a prospective juror about whom he has reservations. The prosecutor may act on a hunch. The record does not support [Pardue's] claim that the prosecutor's reservations were pretexts for race discrimination.

We also observe that an African–American person served on the jury. While the circumstance that a prosecutor accepted a panel containing members of the cognizable group is not conclusive, it is an indication of the prosecutor's good faith in exercising peremptory challenges.

*Id.* at *8-9 (citations omitted).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" regarding *Batson* claims that "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). Under the AEDPA, a federal habeas court may only grant relief "if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice v. Collins*, 546 U.S. 333, 338 (2006). This "standard is doubly deferential: unless the state appellate court was objectively unreasonable in concluding that the trial court's credibility determination was supported by substantial evidence, we must uphold it." *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012).

Under these standards, the trial court's determination that the prosecutor did not engage in purposeful discrimination was not an unreasonable application of Supreme Court authority. For the reasons discussed above, a review of the record provides no indication that the

prosecutor's race-neutral justifications were mere pretext for discrimination. Indeed, Justice

Breyer has commented that "the exercise of a peremptory challenge can rest upon instinct not

reason." *Rice*, 546 U.S. at 343 (Breyer, J., concurring). It is Pardue's burden to prove

purposeful discrimination. *See Purkett*, 514 U.S. at 768 ("the ultimate burden of persuasion

regarding racial motivation rests with, and never shifts from, the opponent of the strike").

Again, Pardue provides no comparative juror analysis that would indicate that the prosecutor's

provided reasons were a sham, and the record does not support that conclusion. Pardue has thus

failed to satisfy his burden at the third stage of the *Batson* inquiry as well. He is therefore not

entitled to relief on his *Batson* claim.

B.     Evidentiary Error (Ground Two)

　　　　Pardue next contends that the trial court erred in excluding evidence of third party

culpability. The Court of Appeal also laid out the following background to this claim:

> Defense counsel sought to introduce evidence that Griffin previously had been
> convicted of a federal offense of smuggling drugs into prison and that McFadzean forced
> her to smuggle narcotics into prison to an inmate named Johnny Jingles. The defense
> theory was that some unknown person shot McFadzean during a drug transaction gone
> bad, and McFadzean forced Griffin on the spot to help him frame [Pardue] to eliminate
> [Pardue] as McFadzean's romantic rival for Griffin's affections. The defense argued the
> evidence was admissible to prove Griffin's motive falsely to identify [Pardue] as the
> perpetrator under Evidence Code section 1101.[12]

>> FN12. Evidence Code section 1101, subdivision (a) makes character evidence
>> generally inadmissible to prove conduct, but subdivision (b) states,
>> "Nothing in this section prohibits the admission of evidence that a person
>> committed a crime, civil wrong, or other act when relevant to prove some
>> fact (such as motive, opportunity, intent, preparation, plan, knowledge,
>> identity, absence of mistake or accident . . .) other than his or her
>> disposition to commit such an act."

> The trial court ruled that all prior convictions for crimes of moral turpitude would
> be admissible for impeachment, but said the defense theory of third party culpability was
> undeveloped. When the issue resurfaced later, the court asked how the proposed

evidence would counter the expected testimony of Richardson and Morris.  Defense counsel said he had "privileged information," which he would disclose only in camera.

Defense counsel then presented a sealed declaration, stating that [Pardue] had provided counsel with information that Griffin and her family feared McFadzean and were coerced into participating in his drug-trafficking operation.  [Pardue] told counsel that during a conversation he had had with Griffin after the shooting, she told [Pardue] McFadzean had a coat in his car trunk containing thousands of dollars in cash from illegal drug sales, which was the real reason that Richardson wanted to protect McFadzean's car. Griffin removed that same coat from her own car while the police were rendering assistance to the injured McFadzean, and this was depicted on the patrol car video. Griffin and McFadzean were not visiting friends in Los Angeles on the day of the shooting.  Instead, they were involved in a drug transaction, during which McFadzean got shot by an unnamed person.  Griffin was driving in search of help and encountered [Pardue] on the street.  Griffin asked [Pardue] to help.  "[Pardue] refused to assist, infuriating all parties in the car, and adding to the bias of the witnesses against him."

Defense counsel indicated he intended to elicit this evidence through cross-examination of the prosecution witnesses.  [Pardue] told counsel he maintained an intimate relationship with Griffin while she engaged in drug trafficking with McFadzean, and if [Pardue] testified, he would likely testify to impeach Griffin's denial of drug trafficking and coercion by McFadzean.  No explanation was provided in the declaration for the presence of the duffel bag in Griffin's backyard that contained ammunition, [Pardue's] parole card, and photographs of a sexual nature depicting Griffin and [Pardue].

Defense counsel also stated he intended to call as a witness a prison inmate, Rosalee Barfield, who was in custody on an unrelated case.  Counsel for Barfield told [Pardue's] counsel Barfield would not speak with [Pardue's] investigator.  However, according to [Pardue], if Barfield testified, and if she did so truthfully, she would testify that the coat containing thousands of dollars had been in her possession until McFadzean and Griffin took it from her by assaulting her with a handgun earlier on the day Morris was shot.

The trial court issued an order allowing the defense to impeach Griffin with two convictions of a crime of "moral turpitude" stemming from the federal smuggling case but excluding the other proffered evidence on the grounds that [Pardue] failed to make a sufficient showing of relevance and, even assuming relevance, the evidence, including the prosecution's response, would require undue consumption of time on collateral issues under Evidence Code section 352.  The court also noted, "counsel now indicates that Ms. G[.], having been apprised of her statements in [Pardue's] motion, now 'recants' such statement.  This court is concerned with [Pardue's] propensity to expand this proceeding into areas well beyond the ambit of this trial."

*Pardue*, 2014 WL 1571806, at *9-10.

It is well settled that, under the Sixth Amendment, an accused has the right to present witnesses, testimony and other evidence in his defense. *See Washington v. Texas*, 388 U.S. 14, 19 (1967). However, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 409-10 (1988). States have considerable latitude under the Constitution to establish rules excluding evidence from criminal trials. *Holmes v. S. Carolina*, 547 U.S. 319, 324 (2006). "Thus, a trial judge may exclude or limit evidence to prevent excessive consumption of time, undue prejudice, confusion of the issues, or misleading the jury. The trial judge enjoys broad latitude in this regard, so long as the rulings are not arbitrary or disproportionate." *Menendez v. Terhune*, 422 F.3d 1012, 1033 (9th Cir. 2005) (citations omitted); *see Montana v. Egelhoff*, 518 U.S. 37, 42-43 (1996) (holding due process rights are not violated by exclusion of relevant evidence where probative value is outweighed by danger of prejudice or confusion).

Federal Rule of Evidence 403, the federal counterpart to California Evidence Code section 352, permits the exclusion of evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." "A district court is accorded a wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of [the proffered evidence], and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 . . . ." *United States v. Abel,* 469 U.S. 45, 54 (1984); *see Boyd v. City and Cnty. of San Francisco*, 576 F.3d 938, 948 (9th Cir. 2009). California employs a similar rule. *See People v.*

*Harris*, 118 P.3d 545, 565 (Cal. 2005) ("We review for abuse of discretion a trial court's rulings

on the admissibility of evidence.").

Under these guidelines, this Court cannot find that the trial court's denial of Pardue's

request was an abuse of discretion or unreasonable or contrary to federal law.  As an initial

matter, the Supreme Court has not yet "squarely addressed" whether a state court's discretionary

exclusion of evidence can ever violate a defendant's right to present a defense.  *See Moses v.

Payne*, 555 F.3d 742, 758-59 (9th Cir. 2008) (considering challenge to state evidentiary rule

allowing discretionary exclusion of expert testimony favorable to defendant); *see also Brown v.

Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (noting that no Supreme Court case has squarely

addressed this issue since *Moses*).  Thus, the Court of Appeal's decision could not have

contravened clearly established federal law under AEDPA.  *Id.*; *see Wright v. Van Patten*, 552

U.S. 120, 125-26 (2008).

Moreover, to the extent that clearly established federal law is implicated by such a claim,

federal law requires that a petitioner demonstrate that the trial court excluded "trustworthy and

necessary exculpatory testimony."  *Cudjo v. Ayers*, 698 F.3d 752, 754 (9th Cir. 2012) (citing

*Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973).  A petitioner must show that the third-

party evidence was "inconsistent with" and "raise[d] a reasonable doubt of" his guilt.  *Holmes*,

547 U.S. at 327.  Pardue fails to meet this standard as the excluded evidence "d[id] not

sufficiently connect the other person to the crime" and "d[id] not tend to prove or disprove a

material fact in issue at [his] trial."  *Id.*  As the Court of Appeal persuasively reasoned:

> Here, the defense did not make an offer of proof as to who would testify about the
> supposed drug transaction at the time of McFadzean's shooting or the supposed third
> party shooting of McFadzean.  The defense merely said that, if [Pardue] testified, he
> would impeach Griffin should she "deny the allegations of drug trafficking and coercion

by Mark McFadzean."  But drug trafficking and coercion were collateral matters which the trial court correctly noted would consume time unnecessarily.  The coat with drug money was also collateral.  Furthermore, the supposed testimony of prison inmate Rosalee Barfield, assuming she did not invoke her Fifth Amendment right against self-incrimination and assuming she testified as defendant hoped, would not speak to the shooting.

Not only did the defense fail to provide direct or circumstantial evidence linking the purported unknown third party drug dealer to the shooting of McFadzean, but the defense theory of this phantom shooter was farfetched and incapable of raising a reasonable doubt.  According to this theory, the shooting occurred during a drug transaction unrelated to [Pardue] , a drug transaction to which Griffin brought her teenage daughter.  After the shooting, Griffin happened to drive by [Pardue] as she was driving around with the unconscious McFadzean, who had a shattered artery that was gushing blood.  Although McFadzean was dying, after a chance encounter with [Pardue], he developed a plan on the fly to blame [Pardue] for the shooting so [Pardue] would no longer be in Griffin's life and coerced Griffin and her daughter to participate in this conspiracy to frame [Pardue].  All of this occurred between the earlier events of the day where [Pardue] waved a gun and expressed anger about Griffin's relationship with McFadzean and the later discovery by police of [Pardue's] duffel bag containing additional rounds of ammunition in back of the home where [Pardue] lay in wait for Griffin to return home with McFadzean—a circumstance that was not mentioned in [Pardue's] offer of proof.

[Pardue] points out that no witness, other than Griffin and McFadzean, testified that [Pardue] shot McFadzean.  This is true, but as we have noted, other witnesses did testify that hours before shooting McFadzean, [Pardue] was at Griffin's house, armed with a gun and furious about Griffin's relationship with McFadzean.  And [Pardue's] own witness, his niece, placed him outside her residence with Griffin and McFadzean shortly before a police officer saw McFadzean in Griffin's maroon car bleeding from a gunshot wound.  The officer testified Griffin waved him down around 1:20 a.m. on March 3, 2008.  [Pardue's] niece testified for the defense that during the "early morning hours" of March 3, 2008, she saw [Pardue] arguing in the street with Griffin near a burgundy car, which she had seen both [Pardue] and Griffin driving in the past.  Griffin's teenage daughter was also there.  According to the niece, either [Pardue] or Griffin knocked on her door.  This is obviously inconsistent with [Pardue's] offer of proof, presented in his attorney's declaration, that [Pardue] refused to get involved when Griffin drove by searching for help for the wounded McFadzean and saw [Pardue] on the street.  That the niece denied hearing a gunshot is inconsequential.

The proffered evidence simply was not capable of raising a reasonable doubt of [Pardue's] guilt.  Further, there was no evidence the unknown third party drug dealer even existed, and if he did, whether he had an opportunity to commit the shooting; nor was there direct or circumstantial evidence linking this unknown person to the shooting.

*Pardue*, 2014 WL 1571806, at *11-12.

Finally, the trial court acted well within its discretion and within the bounds of the

Confrontation Clause in determining that the limited probative value of the evidence was

outweighed by the undue consumption of time that the presentation of such evidence would

require as well as the danger of confusion to the jury.  *See United States v. Scheffer*, 523 U.S.

303, 314 (1998) (noting that "collateral litigation prolongs criminal trials and threatens to

distract the jury from its central function of determining guilt or innocence").  For the foregoing

reasons, Pardue is not entitled to relief on this claim.

C.     <u>Ineffective Assistance of Counsel</u> (Ground Three)

Pardue additionally alleges that trial counsel rendered ineffective assistance when he

failed to object to the trial court's sanitizing of the prosecution witnesses' prior convictions for

impeachment purposes.  The Court of Appeal summarized the following background:

> The defense moved in limine to impeach Griffin and McFadzean with prior
> convictions, as follows: (1) As to Griffin—1997, solicitation of lewd act; 2006, federal
> conviction of conspiracy to provide an inmate with a prohibited object, possession of
> heroin with intent to distribute, and possession of marijuana with intent to distribute.
> (2) As to McFadzean—1990, aid/abet unlawful entry; 1992, theft, sexual assault, and
> fraud; 1993, battery and robbery; 1995, trespass to vehicle and cocaine possession; 1996,
> sexual assault and possession of stolen car; 1997, possession of stolen car; 1998,
> possession of stolen car; and 1999, armed robbery and bank robbery.
>      The trial court also ruled that [Pardue's] prior convictions would be admitted if he
> testified, but as requested by the defense, the convictions would be sanitized by calling
> them crimes of moral turpitude.[13]  As for the prosecution witnesses, the prosecution asked
> that the court sanitize their prior convictions just as it had done for [Pardue], and the trial
> court granted that request.  Ultimately, four witnesses—two prosecution witnesses
> (Griffin and McFadzean) and two defense witnesses ([Pardue's] niece and
> brother)—admitted prior convictions or adjudication involving "moral turpitude."

> FN13.  Ultimately, [Pardue] did not testify.

*Pardue*, 2014 WL 1571806, at *12.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Pardue must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,*

474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

In this case, Pardue fails to satisfy either prong.  He cannot show that his counsel's performance was deficient because, as the Court of Appeal reasonably concluded, counsel made a reasonable tactical decision not to object to sanitizing because "[Pardue's] own witnesses had prior records which defense counsel may have preferred not to name, including [Pardue] if he chose to testify."  *Pardue*, 2014 WL 1571806, at *13.  Pardue has failed to overcome the strong presumption that his counsel's acquiescence was a tactical decision which this Court may not second-guess.  *Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Strickland*, 466 U.S. at 690-91.

Nor can he show prejudice.  The Court of Appeal found that "[t]he evidence against [Pardue] was compelling" and that it was "not reasonably probable [Pardue] would have obtained a better result had the prior convictions not been sanitized as crimes of moral turpitude."  *Pardue*, 2014 WL 1571806, at *13.  This conclusion is both reasonable and fully supported by the record, which reflects that four witnesses testified to his crimes and that Pardue

fled the state after the crimes and made admissions of guilt.[8]  Consequently, Pardue cannot

prevail on his ineffective assistance claim.

D.     Prosecutorial Misconduct (Ground Four)

Finally, Pardue avers that the prosecutor committed misconduct during summation in a

number of ways.  Federal habeas review of prosecutorial misconduct claims is limited to the

narrow issue of whether the alleged misconduct violated due process.  *See Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986).  To prevail on such a claim, a petitioner must show that

the prosecutor's conduct "so infected the trial with unfairness as to make the resulting conviction

a denial of due process."  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  Moreover,

"[o]n habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct,

warrant relief only if they 'had substantial and injurious effect or influence in determining the

jury's verdict.'"  *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v.*

*Abrahamson*, 507 U.S. 619, 637-38 (1993)).

Indeed, counsel are given latitude "in the presentation of closing arguments," and courts

must allow prosecutors "to strike hard blows based on the evidence presented and all reasonable

inferences therefrom."  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (quoting *United*

*States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)); *United States v. Molina*, 934 F.2d 1440,

---

[8]     Other courts have admonished that harmless error review should not be confused
with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307,
324 (1979).  *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015) ("Time and time
again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a
review for whether there was sufficient evidence at trial to support a verdict.").  The Court's
reliance on the overwhelming evidence against Pardue in finding that any error was harmless
does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the
influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors,"
including the overall strength of the prosecution's case.  *Id.* at 904.

1445 (9th Cir. 1991) (noting that a prosecutor must have "reasonable latitude" to fashion closing arguments). A reviewing court should consider challenged remarks in light of the realistic nature of closing arguments at trial. In determining whether remarks rendered a trial fundamentally unfair, a court must judge the remarks in the context of the entire proceeding to determine whether the argument influenced the jury's decision. *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden*, 477 U.S. at 179-82. A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice. *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation).

As an initial matter, the Court of Appeal rejected Pardue's first four arguments listed below due to a failure to object at trial. Consequently, because the state appellate court found these contentions forfeited under California's contemporaneous objection rule, they are procedurally defaulted from federal habeas review. *Coleman*, 501 U.S. at 729-30 (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment). The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial. *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004). Moreover, even if the arguments were not procedurally defaulted, Pardue would not be entitled to relief on them because, as discussed in further detail below, they, like the fifth and final argument which is not defaulted, are without merit.

1. *Argument regarding disbelieving the prosecution witness*

Pardue first argues that the prosecutor misstated the burden of proof by arguing that acquittal would require wholesale rejection of the testimony of all of the prosecution witnesses. During his argument, the prosecutor summarized the testimony of the prosecution witnesses, after which he commented that "you have to say I don't believe all of these people to find [Pardue] not guilty."  The Court of Appeal rejected Pardue's claim, concluding that it was "confident the jury would understand the prosecutor's remarks, not as reducing the burden of proof, but as legitimate comment on the prosecutor's perception of the strength of the prosecution's case."  *Pardue*, 2014 WL 1571806, at *16.  This Court finds that the state court's conclusion was not unreasonable.  "While it is clear that prosecutors cannot express their opinion about a defendant's guilt, . . . a prosecutor is free to voice doubt about the veracity of a defendant's story."  *Dubria v. Smith*, 224 F.3d 995, 1004 (9th Cir. 2000) (citations omitted); *see also United States v. Molina*, 934 F.2d 1440, 1444 (9th Cir. 1991) (noting that the inference that one side is lying is unavoidable).

2. *Argument regarding D.W. not testifying*

Pardue also alleges that the prosecutor committed misconduct by telling the jury that D.W. was too traumatized to testify and by telling the jurors what her testimony would have been had she testified.  However, contrary to Pardue's contention, the record does not reflect that the prosecutor told the jury what D.W.'s testimony would have been.  Rather, as the Court of Appeal concluded, the prosecutor merely stated that, if D.W.'s testimony would have been different from her previous statements, the defense would have called her as a witness.

-31-

Consequently, the appellate court's rejection of the claim was reasonable and consistent with

federal law.  *See*

*United States v. Williams*, 990 F.2d 507, 510 (concluding that "[b]ecause the defense counsel

'opened the door' to the issue of the uncalled witness, the prosecutor's reply was permissible");

*see also United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000) ("A prosecutor's

comment on a defendant's failure to call a witness does not shift the burden of proof, and is

therefore permissible, as long as the prosecution does not . . . comment[] on the defendant's

failure to testify").

> 3.     *Comments regarding Pardue not going to the police*

Pardue next complains that the prosecutor commented on his exercise of his right not to

discuss the case with the police after suspicion focused on him.  A suspect has a constitutional

right not to speak to police after he is arrested and given his *Miranda* warnings.  *Miranda v.*

*Arizona*, 384 U.S. 436, 479 (1966).  As a consequence of that right, prosecutors are prohibited

from commenting on a defendant's post-*Miranda* silence.  *Doyle v. Ohio*, 426 U.S. 610, 618-19

(1976); *United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007) (prosecutor's comment on

defendant's post-*Miranda* silence violates Doyle).  The rationale for this rule "rests on the

fundamental unfairness of implicitly assuring a suspect that his silence will not be used against

him and then using his silence to impeach an explanation subsequently offered at trial."

*Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (citation and internal quotation marks

omitted) (holding that prosecution may not use defendant's silence during case-in-chief).

Generally speaking, however, prosecutors are allowed to comment on a defendant's

pre-arrest silence.  *Jenkins v. Anderson*, 447 U.S. 231, 240-41 (1980); *United States v. Oplinger*,

150 F.3d 1061, 1067 (9th Cir. 1998) ("[N]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment, in the face of accusations of criminal behavior.") (internal quotation marks and citation omitted), overruled on other grounds, *United States v. Contreras*, 593 F.3d 1135 (9th Cir. 2010) (en banc).

Here, as the Court of Appeal reasonably found, "the prosecutor . . . commented on [Pardue's] failure to come forward *prearrest*, when he apparently saw on the news that his girlfriend was accusing him of kidnapping their daughter." *Pardue*, 2014 WL 1571806, at *18. Thus, the prosecutor's comment did not implicate due process. *Jenkins*, 447 U.S. at 240-41; *Oplinger*, 150 F.3d at 1067. The state court therefore reasonably rejected Pardue's argument.

4.    *Argument regarding Santa Claus*

Pardue additionally complains that the prosecutor stated in rebuttal argument that "if you believe that [Pardue] is not guilty, then you must believe in Santa Claus. You must not be using your common sense." But again, as the Court of Appeal reasonably found, "[t]he argument in no way minimized the burden of proof" because it "merely suggested gullibility as the only means to disregard the overwhelming evidence." *Pardue*, 2014 WL 1571806, at *19. Pardue's argument to the contrary is plainly without merit.

5.    *Comment regarding defense counsel*

Finally, Pardue contends that the prosecutor accused defense counsel of trying to mislead the jurors. The Court of Appeal summarized the following argument:

> "Another thing [defense counsel] said was, [w]ell, since this is a circumstantial evidence case, there's two ways you can think about it. And then, if you think . . . there's some evidence that he's innocent, then you must find him innocent.
> "But . . . this is a direct evidence case. This is not a circumstantial evidence

case . . . . [¶] . . . [¶]

> "This is direct evidence.  You have witnesses that said, No, I saw [Pardue] shoot the gun.  I saw [Pardue] make the threats.  I saw [Pardue] with my own eyes do all these crimes.  There's no circumstantial evidence in this case, ladies and gentlemen.  So you're not doing this [']either or['] that [defense counsel] was talking [sic].  He's trying to fool you.  He's trying to pull the wool over your eyes.

*Pardue*, 2014 WL 1571806, at *19.

But contrary to Pardue's contention, the prosecutor's statement was directed at the strength of the defense on the merits and did not amount to an improper disparagement of defense counsel.  *See United States v. Ruiz,* 710 F.3d 1077, 1086 (9th Cir. 2013) (prosecution's characterization of defense's case as "smoke and mirrors" was not improper where comment was directed to strength of the case and was not an *ad hominem* attack on defense counsel) (citation omitted); *People v. Stitely*, 108 P.3d 182, 212-13 (Cal. 2005) (prosecutor's use of "colorful language" to criticize "counsel's tactical approach" was not improper where the comments were "explicitly aimed at counsel's closing argument and statement, rather than at him personally").  Accordingly, the state court's finding that the prosecutor was "describing the deficiencies in opposing counsel's tactics" is reasonable and must be upheld on habeas review.  *See Inthavong*, 420 F.3d at 1058-59.  Pardue thus fails to advance any meritorious argument in support of his prosecutorial misconduct claim.

## V. CONCLUSION AND ORDER

Pardue is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: March 8, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge